*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 21-TX-0473 & 21-TX-0627

DISTRICT OF COLUMBIA, APPELLANT,

V.

DESIGN CENTER OWNER (D.C.) LLC, *et al.*, APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(2018-CVT-000803 & 2018-CVT-000804)

(Hon. Maurice A. Ross, Trial Judge)

(Argued September 22, 2022          Decided December 29, 2022)

*Ashwin P. Phatak*, Deputy Solicitor General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time, and *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time, were on the brief, for appellant.

*John Chamberlain*, with whom *William M. Bosch* was on the brief, for appellees Design Center Owner (D.C.) LLC, Washington Design Center Subsidiary LLC, Office Center Owner (D.C.) LLC, and Washington Office Center LLC.

*Michael F. Dearington*, with whom *Sean W. Glynn* and *Jackson D. Toof* were on the brief, for appellees The Museum of the Bible, Inc. and WOC LLC.

Before DEAHL, *Associate Judge*, and THOMPSON and GLICKMAN,[*] *Senior Judges*.

DEAHL, *Associate Judge*:  This appeal is about the extent to which the District can tax a particular type of commercial real estate transaction.  It directly concerns a $250 million purchase of real estate, with appellees—the buyers and sellers of the real estate, whom we refer to collectively as the taxpayers—successfully arguing in the trial court that they did not need to pay taxes on about 70% of that amount.  Adding to the importance of this issue is that it has started to arise in other taxation disputes, as more entities have begun structuring their commercial real estate sales in a manner similar to how the taxpayers here structured their sales, in an apparent effort to lighten their tax burdens.

We start by outlining some basic propositions necessary for understanding the issue presented.  First is that the District generally taxes the sale of real estate as a percentage of the total sale, usually around 3%, divided equally between the buyer and seller.  D.C. Code §§ 42-1103, 47-903.  It does so through two different taxes, called transfer and recordation taxes, and those taxes are levied against both the value of the land and the improvements, such as buildings, thereon—whatever real

---

[*] Judge Glickman was an Associate Judge of the court at the time of argument. He began his service as a Senior Judge on December 21, 2022.

estate is being transferred. Second is that the District generally does not tax either the formation or termination of ground leases of less than thirty years. *Id.* §§ 42-1101(3)(B), 47-901(3). A ground lease is an agreement between a landowner and (usually) a developer where, in exchange for rent payments, the landowner permits the developer to build improvements on the land and use it for a specific term of years, often decades. At the end of the lease term, the landowner not only regains exclusive rights to the land but also acquires any improvements that remain. Both the lease's inception and its termination are generally not taxable events so long as the lease is for less than thirty years, despite there being some transfer of long-term property interests at both points in time.

This appeal concerns the sale of land encumbered by a ground lease, where the buyer paid both for the land and for the early termination of a ground lease encumbering it, thereby immediately acquiring title to both the land and its improvements. The parties agree that the land sale is taxable, but disagree about whether the payment for early termination of the ground lease is. That question matters a great deal, as illustrated by this case: In the $250 million transaction at issue, the buyers and sellers apportioned about $76 million to the land sale—the tax-assessed value of the land alone, on which they paid taxes—but treated the remaining ~$174 million as consideration for the early termination of ground leases

encumbering that land and did not pay taxes on that sum. The District seeks to tax the entire value of the transaction, arguing that what the buyer in this scenario is really purchasing is fee simple title to the land and all of its improvements, so that the District may tax it like any other sale of land plus improvements. The taxpayers counter that, under the relevant statutes, the District may tax only the land transfer, because ground lease terminations are not themselves taxable. The trial court agreed with the taxpayers and granted summary judgment in their favor.

We reverse. The District is correct that the taxpayers have not satisfied their tax obligations by paying taxes on the land sale alone, as that fails to account for the buyers' acquisitions of the improvements on the land, for which taxes are due. We agree with the taxpayers (and the trial court) to the limited extent that the early termination of a ground lease is not itself a taxable event. But these transactions were more than just transfers of land and the early termination of ground leases encumbering it. The buyers also acquired—and unquestionably paid a substantial amount for—the sellers' reversionary interests in the improvements on the land; the transfers of those reversionary interests were taxable and yet entirely unaccounted for in how the taxpayers structured their sale and tax payments. The taxpayers in effect, albeit silently, lumped the value of those reversionary interests together with the consideration paid for the early ground lease terminations and thereby

improperly reduced their tax burdens. Because the Superior Court's order granting summary judgment for the taxpayers did not recognize the taxable transfer of those reversionary interests, on which the taxpayers failed to pay taxes, we reverse its order and remand for further proceedings. We agree with the trial court's conclusion that penalties are not warranted in this case, however, and uphold that portion of its order.

## I.

This case stems from the sale of two adjacent properties in Southwest D.C. The first, located at 300 D Street SW (the Design Center site), now houses the Museum of the Bible. The second, located at 409 3rd Street SW (the Office Center site), is the site of a large commercial office building. As of June 2012, both properties were owned by Vornado Realty via two of its subsidiaries: Design Center Owner (D.C.) LLC and Office Center Owner (D.C.) LLC. These subsidiaries, in turn, had entered into commercial ground leases with two subsidiaries of their own: Washington Design Center Subsidiary LLC and Washington Office Center LLC.

As Vornado's expert witness explained during discovery, a commercial ground lease "is an arrangement by which the lessee (often a real estate developer or operator) leases real property, usually for an extended term, in order to install improvements and operate the property for the production of income." Those

improvements are key to this type of leasehold agreement. To the landowner, a ground lease "enables the property to be developed without cost." Stuart M. Saft, *Commercial Real Estate Transactions* § 8.2 (3d ed. July 2022 update). For their tenant, a ground lease permits erection of a profitable improvement "without a large capital expenditure [for the land]." *Id.* Perhaps as a result, ground leases do not always follow the common law rule that "[w]hen a lessee of land erects a permanent building . . . [the lessor's] ownership attaches immediately." *Hebrew Home for the Aged v. District of Columbia*, 142 F.2d 573, 574 (D.C. Cir. 1944). Instead, "many ground leases provide that the improvements are the tenant's property and that the fee owner can acquire them only if they are left on the property after the ground lease terminates." Saft, *supra*, § 8.12.[1]

The two ground leases in this case, which originated in the early 1980s, were largely identical. Both involved initial lease terms in the range of twenty-five to twenty-nine years, and each included options for two successive ten-year extensions. Both required the lessees to construct and operate "the Improvements described in

---

[1] This appears to be the typical structure of ground leases in the District of Columbia. As the D.C. Bar's practice manual explains, improvements constructed under a ground lease "are owned for tax purposes by the ground lessee. At the conclusion of the leasehold estate, by expiration or termination, ownership of the improvements customarily reverts to the ground lessor." District of Columbia Bar Association, *District of Columbia Practice Manual* 1054 (28th ed. 2020).

the Improvement Covenant." And finally, both stated, in almost identical language, that:

> Fee simple title to any additions, alterations, restorations, repairs and replacements to the existing Improvements and all Improvements hereafter erected or located on the Land shall be in Lessee. Notwithstanding the foregoing, the terms of this Lease shall apply to all Improvements . . . [and] the same shall be surrendered to and shall become the full and absolute property of Lessor at the expiration or earlier termination of the Lease Term.

In other words, these ground leases departed from the common law rule and placed initial ownership of any buildings on the property with the tenants; the landowners merely held a reversionary interest that would convert to a present interest upon the extinction of the leasehold estate.

In 2012, the Vornado companies agreed to sell the two properties to Hobby Lobby Stores, Inc., for a combined $250 million ($50 million for the Design Center site and $200 million for the Office Center site).[2] The parties executed two sales

---

[2] To break that down further, of the $50 million purchase price for the Design Center site, roughly $37 million was apportioned to the land transfer and $13 million to the termination of the ground lease; of the $200 million purchase price for the Office Center site, roughly $39 million was apportioned to the land transfer and $161 million to the termination of the ground lease. Of note, while the land of the two adjacent sites was of roughly the same value under that apportionment, the value apportioned to the termination of the Officer Center ground lease was more than ten times that apportioned to the termination of the Design Center ground lease.

agreements requiring the Vornado companies to deliver "[a] deed . . . conveying the fee estate in the Land and Improvements" in both properties to Hobby Lobby and "terminat[e] the Ground Lease[s]" with their lessee subsidiaries. A single Vornado executive signed the purchase agreements on behalf both the Vornado lessor companies and their lessee subsidiaries. Prior to closing, Hobby Lobby assigned all of its "rights, interests, liabilities, and obligations" under the contracts to two subsidiaries: WOC, LLC and Museum of the Bible, Inc.

At closing the following month, the parties completed the transaction by executing two sets of documents. The first—styled "Special Warranty Deeds"— were signed by the Vornado lessor companies and the Hobby Lobby companies. They conveyed "in fee simple, all of that certain land situate . . . described on Schedule 1 attached hereto, together with all improvements situated thereon and all rights, titles and interests appurtenant thereto." Schedule 1 of the deeds, which contained the legal description of the properties, likewise referred to "[a]ll that certain lot or parcel of land together with all improvements thereon." And Schedule 2 of the deeds, which described the exceptions to the buyer's fee simple ownership, made no reference to the ground leases with the Vornado subsidiaries. Copies of these special warranty deeds were recorded with the District.

In addition, the parties executed a set of documents styled "Termination of Ground Lease and Memorandum." Unlike the special warranty deeds, these documents identified the Hobby Lobby companies as the lessors of the two properties and stated that they were parties to "that certain Ground Lease" with the Vornado lessee subsidiaries. They provided that, for "good and valuable consideration, the receipt and sufficiency of which are acknowledged, Lessor and Lessee agree . . . [that] the Ground Lease and the Memorandum are hereby terminated." Copies of these lease termination memoranda were likewise recorded with the District. Like the purchase agreements, both the special warranty deeds and these lease termination agreements were signed by a single Vornado executive on behalf of all four Vornado companies.

While the parties placed enough money to pay transfer and recordation taxes on the full $250 million transaction cost into escrow, both Vornado and Hobby Lobby took the position that only the value of the land itself—and not the consideration paid for the termination of the ground leases—was taxable. Accordingly, when they submitted the two special warranty deeds for recordation, their accompanying Form FP-7/C filings reported a total purchase price of just $76 million. This amount was the "the assessed value of the Land for real property tax purposes," which the parties' purchase agreements had allocated toward "Fee

Owner's fee title to the Property." This resulted in a tax bill of about $1.7 million.[3]

The purchase agreements allocated the remaining $174 million of the total transaction "to termination of Leasehold Owner's leasehold title." Consistent with their interpretation of the tax statutes, the parties filed no Form FP-7/C when they recorded their lease termination memoranda, and accordingly paid no transfer or recordation taxes.

Six years after this transaction closed, it came under the scrutiny of District tax officials during what they describe as a routine audit. Those officials took a dim view of the position that only $76 million of a $250 million transaction was taxable. Upon the audit's completion, the District's Office of Tax and Revenue (OTR) sent the taxpayers Notices of Proposed Audit Changes concluding that "the taxable consideration reported . . . has been understated" for the Office Center and Design Center sites. The notices calculated tax deficiencies of approximately $4.7 million and $317,000, respectively, and further informed the taxpayers that these deficiencies "[are] subject to an accuracy-related penalty." Of note, the notices

---

[3] The taxes on the land itself were discounted below the standard rate. For reasons immaterial to the issues before us, the Museum of the Bible applied for and was granted a partial exemption from the recordation tax on the Design Center property sale.

referred both to the special warranty deeds and the lease termination memoranda, identifying these instruments by document number.

After several back-and-forths with the taxpayers, and having "carefully considered all the information presented," OTR issued Notices of Final Assessment of Tax Deficiency. Like the initial notices, these final assessments identified tax deficiencies of approximately $4.7 million and $317,000 for the two properties. Additionally, OTR assessed accuracy-related penalties (40% for the Office Center site and 20% for the Design Center site), as well as interest. All told, the bill came to just over $11 million. And, like the audit notices, the final assessments referred to both the special warranty deeds and the lease termination memoranda, identifying these instruments by document number.

The taxpayers paid this assessment under protest and filed an appeal of that assessment in the Superior Court. *See* D.C. Code § 47-3303. Their petitions raised two principal arguments: that the District "lacks statutory authority to assess transfer and recordation taxes on ground-lease terminations," and that these assessments were so inconsistent with the District's prior conduct that they constituted a denial of the taxpayers' rights to equal protection of the law. Following extensive discovery, the Superior Court granted the taxpayers' motion for summary judgment,

finding that they were not required to pay transfer and recordation taxes on the ground lease terminations and that, even if they were, accuracy-related penalties would not be warranted.[4]

On the question of taxability, the court identified two principal reasons for concluding that the ground lease terminations were not taxable events. First, the court observed that applicable statutes condition payment of the taxes on the submission of a "deed" for recordation. *See* D.C. Code § 47-903(a)(1) (imposing transfer tax "at the time the deed is submitted to the Mayor for recordation"); *id* § 42-1103(a)(l) (imposing recordation tax "[a]t the time a deed, including a lease or ground rent for a term (with renewals) that is at least 30 years, is submitted for recordation"). "Deed," in turn, has a statutory meaning of "any document, instrument, or writing" in which real property or an interest therein "is conveyed, vested, granted, bargained, sold, transferred, or assigned." *Id.* § 47-901(3) (transfer tax); *id.* § 42-1101(3)(A) (recordation tax). Applying the *expressio unius* canon of statutory construction, the court reasoned that because each of these actions— convey, vest, grant, bargain, sell, transfer, and assign—refers to an act of conveyance, taxable deeds are only those instruments by which a real property

---

[4] Because it resolved their claims on statutory grounds, the Superior Court declined to address the taxpayers' constitutional arguments.

interest is *transferred* from one party to another. Because the lease termination agreements did not transfer real property interests to the Hobby Lobby companies, but rather simply *terminated* an encumbrance on the property held by the Vornado lessees, the court concluded that they were not "deeds" subject to the transfer and recordation taxes.

Second, the trial court found that even if the term "deed" were construed to include ground lease terminations, those same statutory definitions expressly exclude "a lease or ground rent for a term (including renewals) that is less than 30 years." D.C. Code § 47-901(3) (transfer tax); *id.* § 42-1101(3)(B) (same as to recordation tax). Here, both parties agreed that the ground leases for the Office Center and Design Center sites had just 17 years (including renewals) remaining in their terms when they were terminated in 2012. And, during discovery, the District's representatives testified that a lease term is determined by considering the portion of the term remaining, not by looking to the length of the term when the lease was entered. Accordingly, the court concluded that the lease termination agreements had too little time remaining in their terms to be "deeds" subject to the District's transfer and recordation taxes.

On the question of accuracy-related penalties, the trial court found that even if it had not granted summary judgment to the taxpayers on the issue of tax liability, it would still conclude that the District had erred in assessing penalties. While the taxation statutes permit penalties for various types of underpayment, they specifically direct that "[a] penalty shall not be imposed . . . if the taxpayer shows that there was reasonable cause for the underpayment and that the taxpayer acted in good faith." D.C. Code § 47-4221(a). The trial concluded that penalties were not warranted "and that there is no genuine issue of material fact as to this issue." The District now appeals.

## II.

We review summary judgment rulings de novo, "conduct[ing] an independent review of the record . . . in considering whether the motion was properly granted." *Expedia, Inc. v. District of Columbia*, 120 A.3d 623, 630 (D.C. 2015) (citation omitted). The taxpayers and the District offer competing views about the nature of this $250 million transaction underlying their divergent positions about its taxability. The taxpayers view the transaction as consisting of two distinct steps—the land sales and the ground lease terminations—and their position, adopted by the trial court, is that the latter step is not taxable. The District, conversely, zooms out and takes a

more aerial view of the transactions.  It asserts that, as to each property, there was a single transaction transferring ownership of the land and buildings to new owners, "plainly meeting the definition of 'deed or other document,'" so that the entire transaction is taxable.

They are both partly right, though the District's view is closer to reality.  The District is correct that the taxpayers did not account for a substantial and taxable transfer of property interests that they were bound, but failed, to pay taxes on.  Namely, the buyers acquired the sellers' vested reversionary interests in the improvements on the land, and the value of that transfer was taxable yet entirely overlooked in how the taxpayers apportioned the $250 million purchase price.  At the same time, it is not quite right—as the District asserts—to say the entire $250 million purchase price was taxable.  Surely some (even if insubstantial) portion of that amount was in fact paid for removing the 17-year ground lease encumbrances on the land.[5]  That amount, whatever its fair value, is not taxable, just as a typical

---

[5] Removal of that encumbrance alone would not have resulted in the buyers' coming into possession of the improvements on the land, absent their acquisition of the sellers' reversionary interests in those improvements, and it was the latter transfer of reversionary interests that was taxable but unaccounted for in how the taxpayers structured their sale and tax payments.

ground lease, or the termination or assignment thereof, is not taxable so long as less than 30 years remain on the term.

How much of the $174 million ostensibly paid for termination of the ground leases was, in reality, taxable consideration for the value of the reversionary interests in the buildings on the land rather than removal of the encumbrances on it is an intensely factual question. We remand that question to the trial court.

**A.**

We begin by detailing the parties' respective views about the taxability of this $250 million transaction, and why we disagree with the taxpayers' narrow view of their tax obligations. While we do not wholly agree with the District's view either, we detail our more minor disagreements with it in the next section.

The taxpayers frame this as a two-step transaction, dovetailing with the two sets of instruments they executed: the special warranty deeds effecting the land transfer, and the ground lease termination memoranda removing the encumbrances on the land. The taxpayers acknowledge that the land transfer was taxable, and they paid transfer and recordation taxes on the portion of the sale that they deemed to be consideration for the land alone (about $76 million, the tax-assessed value of that

land). But they maintain that the second step of the transaction, the ground lease terminations, was not taxable.

In the taxpayers' view, when a ground lease places title to improvements in the lessee, that title is not "transferred" back to the landowner upon the ground lease's termination, and so it is not taxable. Rather, any transfer of a property interest takes place when the ground lease is first executed. At that time, the ground lease fully vests the lessee with a possessory interest in the land and an ownership interest in any improvements thereon. Simultaneously, the lessor is vested with "a reversion in fee simple absolute," entitling them to repossess the land and acquire "full and absolute" ownership of those improvements upon termination of the ground lease. Thus, the taxpayers argue that when the ground lease termination memoranda were signed in 2012, there was no transfer of the buildings that had been constructed on the properties. "None was necessary, because the ground leases established all rights and interests in the properties at the conclusion of the leases." As their expert put it during discovery, all that occurred when the ground leases were terminated was the "automatic[] conver[sion]" of the lessors' already-vested future ownership interests into present ownership interests.

The District says that is a bogus construct, both overly formalistic and detached from the "reality of these transactions." Instead, it views this $250 million deal as a coordinated transaction in which both land and buildings alike were "sold to . . . two [Hobby Lobby] companies that previously had no interest in them . . . in exchange for a combined $250 million." Under that framing, the remaining details are just semantics. "[N]o matter what mechanism—however unusual or clever—the parties use[d] to effectuate such a transfer," the result was the ownership of both land and the buildings passing from Vornado to Hobby Lobby. And that transaction, the District argues, falls squarely within the scope of the tax statutes. As the District's counsel put it during oral arguments, "differentiating between the special warranty deeds and the ground lease terminations here is an artificial distinction."

We largely agree with the District's view. The taxpayers' accounting of the transaction does not reflect reality, for reasons beyond its formalism. It entirely ignores a massive taxable transfer of property interests that occurred in this transaction. The taxpayers fail to explain how the Hobby Lobby companies— entities that previously had no connection to either site—came into possession of the future interests in the improvements in the first place. It was the Vornado lessor companies who had the vested reversionary interests in the buildings on the land before this $250 million deal, and who stood to take ownership of those buildings

upon the ground lease terminations.  But it was the Hobby Lobby companies who held those reversionary interests after the deal.  That transfer is completely missing from the taxpayers' analysis.  So how was it effected?  While we doubt the particular mechanism matters much, it appears that transfer came by way of the special warranty deeds executed as the first step of this transaction.  According to their terms, those deeds transferred not only the sellers' fee simple interests in the land but also their reversionary interests in the buildings to new owners.  That transfer of the reversionary interests in the buildings was taxable, but the taxpayers apportioned none of the $250 million to the transfer of those reversionary interests and improperly failed to pay any taxes on it.

Recall that the purchase agreements executed by the taxpayers contained two commitments in exchange for the $250 million purchase price: (1) deliver "the fee estate in the Land *and Improvements*," and (2) "terminat[e] the Ground Lease[s]." (emphasis added)  The special warranty deeds executed at closing accomplished this first step.  By their terms, these instruments conveyed from the Vornado lessor companies to the Hobby Lobby companies "in fee simple, all of that certain land . . . *together with all improvements situated thereon*." (emphasis added)  This latter grant of "all improvements situated thereon" cannot refer to some present possessory interest in the buildings.  By the terms of the ground leases, the lessors had none:

"[f]ee simple to . . . all Improvements [] erected or located on the land [was] in Lessee." Instead, it refers to the lessors' reversionary interests: their right to "full and absolute" ownership of the improvements erected on the two sites "at the expiration or earlier termination of the Lease Term."[6] And so when the Vornado lessors and Hobby Lobby companies executed the special warranty deeds, these instruments conveyed both the lessors' present ownership interest in the land and their future ownership interest in its improvements.

In short, the special warranty deeds conveyed reversionary interests to the improvements on the land that the taxpayers did not account for when attempting to satisfy their tax obligations. With that in mind, we now explain how the District's transfer and recordation tax statutes apply to this transaction.

**B.**

As properly understood, this case boils down to a dispute over how to tax a transaction in which the parties (1) transferred present ownership interests in two plots of land, (2) transferred vested reversionary interests in the lands'

---

[6] Our statutes term such a property interest an "estate in expectancy" and permit its sale or transfer "in the same manner as estates in possession." D.C. Code §§ 42-508, -515.

improvements, and (3) then terminated two ground leases encumbering the land and its improvements. To resolve that question, we turn to the text of the relevant statutes.

The District requires that within 30 days of the execution of "a deed or other document by which legal title to real property, an estate for life or a lease or ground rent (including renewals) for a term that is at least 30 years, or an economic interest in real property is transferred," a copy of that "deed or other document" be submitted to the District's Recorder of Deeds. D.C. Code § 47-1431(a). That act—submitting a deed for recordation—is what triggers the assessment of the two taxes, which are typically calculated as a percentage of the consideration paid for the transfer. *See id.* § 42-1103(a)(1) (recordation tax); *id.* § 47-903(a)(1) (transfer tax).[7] A "deed" is defined as "any document, instrument, or writing (other than a lease or ground rent (including renewals) that is less than 30 years) . . . whereby any real property in the District, or any interest therein (including an estate for life), is conveyed, vested, granted, bargained, sold, transferred, or assigned." *Id.* § 47-901(3) (transfer tax);

---

[7] In the event that either no or nominal consideration is paid for the transfer, the taxes are assessed as a percentage of the fair market value of the property. D.C. Code §§ 42-1103(a)(1)(A), 47-903(a)(1)(B). For leases or ground rents of more than 30 years, the taxes are based on the average annual rent over the term of the lease. *Id.* §§ 42-1103(a)(1)(B)(i), 47-903(a)(2).

*see also id.* § 42-1101(3) (recordation tax). Putting those provisions together, any time parties execute any instrument by which any interest in real property is "conveyed, vested, granted, bargained, sold, transferred, or assigned," they must record a copy of that instrument with the District and pay the appropriate transfer and recordation taxes, unless a statutory exemption applies.

In this case, the parties executed two relevant sets of instruments to effect this transaction: a pair of ground lease termination memoranda and a pair of special warranty deeds. The ground lease termination memoranda are not taxable deeds under the tax statutes, but the special warranty deeds are, as explained in turn below. And, as further explained in Part II.B.2 below, the special warranty deeds conveyed substantial and taxable property interests that the taxpayers failed to pay taxes on, making some assessment by OTR appropriate.

*1. The terminations of the ground leases themselves are not taxable.*

We agree with the taxpayers and the trial court on the limited proposition that, as the trial court put it, the ground lease termination memoranda were not taxable "deeds" within the meaning of the tax statutes. The memoranda did not "convey, vest, grant, bargain, sell, transfer, or assign" any real property. *See id.* § 47-901(3) (transfer tax); *id.* § 42-1101(3)(A) (recordation tax). They simply terminated the

lessees' possessory interests and thereby converted the lessors' preexisting reversionary interests into present interests. Neither of these acts—terminating a property interest or converting a vested future interest to a present one—is a transfer or conveyance as contemplated by the taxation statutes.

While the District counters that the termination of the ground leases "had the effect of transferring ownership in the buildings from the subsidiary-sellers to the new owners," that is not quite right. The buyers already had a vested reversionary interest in the buildings—they attained those interests via the special warranty deeds—and the termination of the ground leases merely removed encumbrances on those preexisting reversionary interests.

To illustrate the point, the District concedes that ground lease terminations are not taxable when they occur naturally, at the end of a lease term. Consider a ground lease with just one month left on its term; under the District's view, if the landowner pays the lessee even a modicum amount to terminate the lease early, the entire value of any buildings on the land would be a taxable sale, whereas none of that value would be taxable if the parties simply waited the month for the lease to terminate. That does not make much sense. There is no cogent reason to think that the natural termination of a ground lease does not convey or transfer a taxable interest in real

property but that its early termination does.  No matter how the termination comes

about, the result is the same: the landowners' reversionary interests become present

interests.  It would be anomalous to say that one is a taxable transfer of real property

but not the other.[8]


To be sure, as the District stresses and the taxpayers do not dispute, there may

be exceptions to the rule that ground lease terminations are not taxable when the

ground leases themselves are entered into with a purpose to evade taxes.  For

instance, one could imagine companies entering into a ground lease with the purpose

of evading taxes by purposefully structuring a lease to terminate immediately after

a land sale.  But there is no suggestion of such an artifice here, where these ground

leases were in place several decades before the transaction at issue.  And such a

subterfuge would not depend upon the early termination of a ground lease; it could

be accomplished through naturally expiring lease terms as well.  In any event, that

---

[8] The District attempts to differentiate these two scenarios by arguing "the natural expiration of a ground lease does not involve a separate document."  That is a hollow distinction that makes little sense as a practical matter, as it could be easily circumvented by enterprising parties.  For instance, parties could simply write into any ground lease a series of early termination points that either party has the ability to opt out of, so that if they ever want the lease to terminate early (perhaps after a sale to a third party), that could be accomplished with no need for any taxable writing, by doing nothing at all.  That view embraces the same type of empty formalism that the District rightly criticizes the taxpayers for advancing.

stratagem can largely be thwarted by taxing the transfer of the reversionary interests in the buildings, as we now discuss.

   *2. The special warranty deeds are taxable and include the transfer of reversionary interests that the taxpayers failed to account for.*

The special warranty deeds are a different matter. By their terms, they "grant[ed] . . . convey[ed] and confirm[ed] unto Grantee, in fee simple, all of that certain land situate . . . together with all improvements situated thereon." Such an act of conveyance falls squarely within the scope of the taxation statutes. The taxpayers do not dispute that point, but instead go awry by failing to recognize that these deeds transferred two distinct property interests: a present and fee simple interest in the land (on which they paid taxes), and a future reversionary interest in its improvements (on which they did not). Their purchase agreements demonstrate that they did not account for the transfer of those reversionary interests in the improvements. They arrived at their $76 million figure for the taxable portion of this exchange based on "the assessed value of the Land for real property tax purposes," by itself. The balance of the $250 million total transaction cost was allocated "to termination of Leasehold Owner's leasehold title to the Property under the Ground Lease."

That does not account for a substantial part of the transaction. The special warranty deeds were instruments used to transfer vested reversionary interests, and a reversionary interest, like other future interests, is a legally cognizable interest in real property. *See, e.g.*, Restatement (First) of Property § 153(1) (1936) ("[A] future interest is an interest in land."). As discussed, the District's transfer and recordation tax statutes apply broadly to any instrument used to convey "any real property in the District, *or any interest therein*." D.C. Code § 47-901(3) (emphasis added); *see also id.* § 42-1101(3)(A)(ii). The transfers of these reversionary interests via the special warranty deeds were therefore taxable, and the taxpayers' failure to pay these taxes when they recorded the special warranty deeds made some assessment by OTR appropriate.

Our holding, that a transfer of a reversionary interest is taxable but the termination of a ground lease is not, not only harmonizes the relevant statutes, but also has the further benefit of resolving the various policy concerns raised by the parties. For its part, the District warns that an inability to tax ground lease terminations would "open a massive loophole," permitting unscrupulous landowners to avoid transfer and recordation taxes through creative transfer schemes. But no matter what process is used, ownership of both the land and improvements necessarily changes hands at some point during the sale of any real property. The

transfer and recordation tax statutes thus apply to that transfer in whatever form it takes. So long as the District can tax the fair value of any transfer of reversionary interests, the loophole it posits closes.

The taxpayers, meanwhile, complain that the District's position marks an unjustified and unexplained change in policy because "the District had never sought to tax a ground lease termination before this case." Before the trial court, the taxpayers went so far as to argue that their treatment by the District's tax officials was discriminatory and raised constitutional concerns. But, as we have explained, that argument ignores the novelty of this case. A ground lease termination alone is not a taxable transfer, but simply a termination of the lessee's interest and the conversion of lessor's interest from future to present. It was only because the ground lease termination here was preceded by a transfer of the reversionary rights underlying the ground lease that the District sought to assess transfer and recordation taxes. The District is simply addressing a new type of transaction—not at issue in the past cases the taxpayers identify—that involves not only the termination of ground leases but a prior transfer of the reversionary interests underlying them.[9]

---

[9] The same reasoning disposes of the taxpayers' warning that if early ground lease terminations are taxable, a lessor could be faultlessly on the hook for taxes whenever their lessee breaches the lease agreement and thereby causes an early termination of the lease. Such an event, like the natural expiration of a lease, would

## C.

That leaves the question of what portion of the $250 million was taxable, beyond the already-taxed $76 million paid for the land transfer. We cannot answer that question on this record, because neither the parties nor the trial court ever sought to answer it. They instead treated the remaining $174 million as a unitary mass— taxable or not as a whole. Both all-or-nothing approaches are mistaken, as we have explained, so that this $174 million needs to be broken down into its taxable and nontaxable components. We remand for the trial court to assess what portion of that $174 million represents the fair value paid for the nontaxable termination of the ground lease encumbrances on the land, and what portion of it represents the fair value paid for the taxable reversionary interests in the improvements on the land.[10] Before we explain why it at least tentatively seems likely that the vast bulk of that amount was paid for the reversionary interests to the buildings on the land, we must first address each party's contention that their opposing party waived any right to such a remand. We detect no such waiver by any party.

---

not be taxable because it does not ordinarily involve the transfer of any taxable real property interest, placing it outside the scope of the District's transfer and recordation tax statutes.

[10] The trial court will likely find it necessary to reopen discovery to resolve this factual question, though we ultimately leave that to the trial court's discretion.

The threshold question is whether any party's all-or-nothing litigation posture, both in the trial court and on appeal (i.e., that the $174 million was all taxable, or all not) effectively waived any entitlement to a remand now. The District suggests the taxpayers should not be able to discount that $174 million even by a marginal sum representing the fair value of the ground lease terminations because it was the taxpayers' burden to show what portion of that $174 million was paid for the early termination of the ground lease and they have failed to do that. The taxpayers retort with the flipside of that argument, that it was the District's obligation to show that the taxpayers had not fairly apportioned the $250 million between the land sale and ground lease termination,[11] and its chosen line of attack was to argue that ground lease terminations are themselves taxable, a view we have now rejected. So it is the District that has waived an apportionment challenge, in the taxpayers' view. Neither argument is persuasive. Both in the trial court and on appeal, all parties took broad positions that the $174 million was either taxable, or not taxable, in toto. Those positions fairly included the lesser arguments that some portion of that amount was taxable, and some not.

---

[11] Part of this argument is that the reversionary interests to the buildings "run with the land," so that the District really should have argued that the taxpayers failed to properly apportion the $250 million between the land and the ground lease terminations. That might be right, but in our view it is immaterial. This was a sufficiently complicated, novel, and non-transparent transaction that we would not penalize the District for failing to foresee our precise holding today.

As for how that $174 million should have been apportioned, that is a factual question we leave for the trial court on remand. When pressed at oral argument, the taxpayers averred that the District's tax assessments for the land—amounting to the $76 million that the taxpayers paid taxes on—incorporated the value of any reversionary interests in the buildings. That is mistaken and inconsistent with the record evidence. Even the taxpayers' statement of undisputed material facts is to the contrary, as it describes the $76 million as "the current tax assessed value of the [two plots of] land," not their improvements or any reversionary interests therein.

The District, conversely, claims that roughly all of the $174 million was paid for the value of the buildings on the land, and virtually none of it was paid to terminate the ground leases thereon. That appears to be closer to the truth for a couple of reasons. First, when Vornado marketed these properties, it advertised the Office Center real estate as being worth $210 million and the Design Center real estate as being worth $46 million. It is hard to explain that $164 million delta between adjacent properties of roughly the same size unless most of that value came from the buildings, rather than from the land itself.[12] Second, and relatedly, recall

---

[12] Indeed, this reality is reflected in the property tax assessments relied on by the taxpayers, which value the land at the Design Center and Office Center sites at roughly $37 and $39 million, respectively.

that of the $174 million paid for the termination of these ground leases, roughly $161 million was paid for termination of the Office Center site ground lease, while only about $13 million was consideration for termination of the Design Center ground lease. *See supra* note 2. Again, that twelve-fold discrepancy suggests that the vast bulk of the $174 million was really being paid for the buildings on the Office Center site, and not for the termination of either ground lease.

Those preliminary indications aside, these are intensely factual questions, on which we have a sparse factual record and no trial court findings. We therefore reverse the Superior Court's order and remand for the trial court to explore these factual questions in the first instance.

## III.

Finally, we address the issue of penalties. Recall that the OTR's final tax assessments included accuracy-related penalties of 40% of the underpayment on the Office Center site and 20% of the underpayment on the Design Center site. The Superior Court disallowed these penalties, finding that even if the taxpayers were required to pay transfer and recordation taxes on the entire $250 million transaction, penalties would be inappropriate in light of the taxpayers' reasonable cause and good faith. We agree.

As relevant here, the applicable statute provides that "[t]here shall be added to a tax imposed by this title an amount equal to 20% of the portion of an underpayment which is attributable to . . . [n]egligence . . . or [a] substantial valuation misstatement." D.C. Code § 47-4211(b)(1). Where the underpayment "is attributable to a gross valuation misstatement," that penalty increases to 40%. *Id.* § 47-4211(b)(2). "Negligence" consists of "a failure to make a reasonable attempt to comply with the provisions of this title or to exercise ordinary and reasonable care in the preparation of a tax return without the intent to defraud." *Id.* § 47-4211(a)(1). And a "substantial" value misstatement is one that misstates the actual valuation by at least 200%, while a "gross" value misstatement is one that misstates the actual valuation by at least 400%. *Id.* §§ 47-4211(a)(2), (4).

A separate statute directs OTR to waive any accuracy-related tax penalties in situations where "the taxpayer shows that there was reasonable cause for the underpayment and that the taxpayer acted in good faith." *Id.* § 47-4221(a). While we have never interpreted this provision, its meaning is easy enough to grasp. As the statute itself explains, "[r]easonable cause generally exists if, based on all the facts and circumstances, the taxpayer exercise[d] ordinary business care and prudence in determining his or her tax obligations." *Id.* § 47-4221(c). Like analogous requirements found in federal statutes, "[t]his standard is objective."

*United States v. Bittner*, 19 F.4th 734, 741 (5th Cir. 2021) (discussing 31 U.S.C. § 5321(a)(5)(B)(ii)(I)); *see also Lefcourt v. United States*, 125 F.3d 79, 84 (2d Cir. 1997) (discussing 26 U.S.C. § 6724(a)). "Good faith," by contrast, refers to one's subjective intent—i.e., "[a] state of mind consisting in [] honesty in belief or purpose." Good Faith, *Black's Law Dictionary* (11th ed. 2019); *see also* Good Faith, *Webster's Third New International Dictionary* 978 (2002) ("[A]bsence of fraud, deceit, collusion, or gross negligence."). Thus, § 47-4221 directs OTR to waive accuracy-related penalties if the taxpayer can demonstrate that their underpayment was both (1) objectively reasonable, and (2) subjectively honest.

With that understanding, we agree with the Superior Court's conclusion that no penalties were warranted here. As to the objective prong, the taxpayers acted with reasonable cause in addressing a convoluted and novel issue. The correct application of the transfer and recordation tax statutes to this transaction is a tremendously difficult question—one that we determine no party got quite right—and the taxpayers' interpretation was not an unreasonable position to take on a difficult issue of first impression. As the District's own Recorder of Deeds acknowledged, the District has never before taken a position on the taxability of ground lease terminations, and she agreed that "reasonable people could disagree

about whether a specific ground lease termination is covered by the[] statutes."[13] While we have concluded that the taxpayers' position was wrong in certain key respects, "ordinary business care" does not require prefect clairvoyance as to every close legal question to be resolved.

Moreover, the record makes clear that the taxpayers' position was the result of reasonable efforts to assess their proper liability—the "most important factor" when determining reasonable care under similarly drafted federal statutes. *Bittner*, 19 F.4th at 742; *see also* Treas. Reg. § 1.6664-4(b)(1) ("Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability."). The record in this case makes clear that the taxpayers did not stumble into their position blindly. During discovery, they identified a phalanx of attorneys who "provided counsel in connection with the purchase of the Office Center Property and the Museum Property," including several who specifically advised on "the payment of recordation and transfer taxes upon the closing of the transactions." As the District itself puts it, "[b]oth Vornado and Hobby Lobby . . . [were]

---

[13] The District attempts to soften this concession, arguing that the Recorder of Deeds never offered an opinion on whether *these* ground lease terminations were taxable. That might be true, but the Recorder's point still stands: the taxation statutes do not directly address ground lease terminations, and reasonable minds can differ on this interpretive question.

represented by capable and experienced attorneys." While that alone is not dispositive, it is indicative of good business care: "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is," at least generally, "reasonable for the taxpayer to rely on that advice." *United States v. Boyle*, 469 U.S. 241, 251 (1985).

The taxpayers likewise demonstrated their subjective good faith. As evidence to the contrary, the District points to the taxpayers' decision to place enough money into escrow to cover transfer and recordation taxes on the full $250 million transaction. But that simply shows an understanding by the taxpayers that their position, even if reasonable and adopted in good faith, was not necessarily sure to prevail in the event the District took a different view. Indeed, when the District pressed Vornado's corporate representative on this exact point, he testified that "[w]e know every transaction that's ever occurred can be challenged," and that while the parties believed that such a challenge would be meritless, "they would put money into escrow in case." While the District suggests that a taxpayer uncertain of their tax obligations should err on the side of caution and simply pay any doubted amounts under protest, good faith does not require preclearance. When one pays all that they genuinely believe that they owe, that meets the good faith standard.

## IV.

For the foregoing reasons, we reverse the Superior Court's order granting summary judgment to the taxpayers, affirm that portion of its order declining to impose underpayment penalties, and remand for further proceedings consistent with this opinion.

*So ordered.*